HAMILTON, Senior Circuit Judge,
dissenting:
After a six-day bench trial, the district judge, who presently is a judge on this court, wrote a ninety-four page decision setting forth innumerable factual findings which lead inexorably to the legal conclusions that South Carolina Code Annotated Regulation 61-12 violates both the Due Process and Equal Protection Clauses of the United States Constitution and that the unconstitutional portions of Regulation 61-12 are not severable from the constitutional portions. Cavalierly, the majority *176 today sets aside this thorough and meticulous decision rendered by our esteemed colleague without identifying a single finding of fact made by him as being clearly erroneous. To accomplish this tour de force, the majority is compelled to set up and defeat a lack of evidence straw man. Unlike the majority, I believe the exhaustive and detailed factual findings made by the district judge amply support, more accurately compel, the decision rendered by him. Because I am in complete agreement with the district judge’s holdings that South Carolina Code Annotated Regulation 61-12 violates both the Due Process and Equal Protection Clauses of the United States Constitution and that the unconstitutional portions of Regulation 61-12 are not severable from the constitutional portions, I dissent.
I
The constitutional issues presented in this case were hotly contested by the parties at trial, with each side putting forth extensive evidence in support of their respective positions. Based on the evidence presented, the district court resolved many factual disputes by making detailed findings of fact. Because many of the district court’s factual findings are completely ignored by the majority, I set forth below the procedural history and facts of this case.
A
Prior to 1995, the State of South Carolina only required licensing of physicians’ offices or other facilities in which second trimester abortions were performed. See S.C.Code Ann. §§ 44-41-20(b), -70(b) (Law.Coop.1995). On January 3, 1995, the South Carolina legislature amended Chapter 41 of Title 44 to require licensing by the South Carolina Department of Health and Environmental Control (DHEC) of any non-hospital medical facility in which five or more first trimester abortions are performed in a month. See id. § 44-41-75(A) (West Supp.1999). This legislation also required DHEC to promulgate regulations concerning “sanitation, housekeeping, maintenance, staff qualifications, emergency equipment and procedures to provide emergency care, medical records and reports, laboratory, procedure and recovery rooms, physical plant, quality assurance, infection control, and information on and access to patient follow-up care necessary to carry out the purposes of this section.” Id. § 44-41-75(B). Pursuant to this enabling legislation, DHEC promulgated a regulation, entitled “Standards For Licensing Abortion Climes,” see S.C.Code Ann. Regs. 61-12 (Regulation 61-12), which sets forth detailed requirements that an abortion clinic[1] must comply with in order to obtain and maintain a license to perform abortions.
On June 27, 1996, the day before Regulation 61-12 temporarily went into effect, Greenville Women’s Clinic (GWC) and Charleston Women’s Medical Clinic, Inc. (CWMC), two medical clinics which offer first trimester abortion services in South Carolina, and Dr. William Lynn (Dr. Lynn), a physician that owns and operates medical practices in Beaufort and Green-ville, South Carolina, brought this action against Douglas Bryant (Bryant) as the Commissioner of DHEC, the Governor- of the State of South Carolina, and the Attorney General of the State of South Carolina challenging the constitutionality of Regulation 61-12. On the same day, the plaintiffs filed a motion for a temporary restraining order, or, in the alternative, for a preliminary injunction.
On July 19, 1996, the district court granted the plaintiffs’ motion for a tempo *177 rary restraining order and enjoined the defendants from enforcing Regulation 61-12, pending a hearing on the issuance of a preliminary injunction. The district court never held a hearing on the issuance of a preliminary injunction because, prior to the hearing date, the parties agreed to continue the injunction pending a decision by the district court on the merits.
Following a six day bench trial, the district court, on February 5, 1999, held that Regulation 61-12 was constitutionally infirm on due process and equal protection grounds. See Greenville Women’s Clinic v. Bryant, 66 F.Supp.2d 691, 724-43 (D.S.C.1999). The district court also held that, in light of both South Carolina law and the text of Regulation 61-12, Regulation 61-12 was not subject to the doctrine of severability. See id. at 743-44. On April 13, 1999, the district court awarded the plaintiffs $324,040.61 in costs and attorneys’ fees. Bryant and the Attorney General of South Carolina appeal both the district court’s decision on the merits and the order awarding costs and attorneys’ fees. The Governor of South Carolina appeals only the district court’s order awarding costs and attorneys’ fees.[2]
B
Located in Greenville, South Carolina, GWC provides gynecological services, including abortions through fourteen weeks of pregnancy measured from the pregnant woman’s last menstrual period (Imp).[3] Drs. Terry Buffkin and Thomas Campbell, two physicians licensed to practice in South Carolina and board certified in obstetrics and gynecology, own and operate GWC. On average, GWC performs approximately 2,746 first trimester abortions per year.
Located in Charleston, South Carolina, CWMC also provides gynecological services, including abortions through 12.5 weeks of pregnancy measured from the pregnant woman’s Imp. On average, CWMC performs 2,408 first trimester abortions per year.
Dr. Lynn owns and operates two medical practices, one in Beaufort, South Carolina, the other in Greenville, South Carolina. Dr. Lynn is licensed to practice medicine in South Carolina and is board certified in obstetrics and gynecology. As part of his practice, Dr. Lynn performs abortions through 13.9 weeks of pregnancy measured from the pregnant woman’s Imp. On average, Dr. Lynn performs 407 first trimester abortions per year in his Beaufort office and 536 first trimester abortions per year in his Greenville office.
All of the abortions performed at GWC, CWMC, and Dr. Lynn’s two practices are first trimester abortions. In fact, there are no abortion providers in South Carolina who perform elective abortions (those not associated with medical complications) in the second trimester of pregnancy.[4]
The most common first trimester abortion procedure performed by the plaintiffs is the suction curettage procedure. The suction curettage procedure is also utilized for spontaneous miscarriages. Although not wholly without risks, it is undisputed that a suction curettage abortion during *178 the first trimester of pregnancy is a safe and quick medical procedure performed between six and fourteen weeks after a woman’s Imp.[5] It involves dilating the cervix, inserting a suction catheter into the uterus, and applying suction to remove the contents of the uterus. Although the patient is usually in the procedure room for a total of ten minutes, the procedure itself only takes approximately two to five minutes. It involves no incision and a minimum of bleeding. The procedure is also performed under general anesthesia or by applying a numbing medicine around the cervix. After the procedure, patients usually walk to the recovery area, where their pulse and blood pressure are monitored, and they are checked for any abnormal bleeding. Possible complications from the suction curettage procedure are fainting from vasovagal response, uterine perforation, excessive bleeding, infection, and retained tissue in the uterus. However, while the total complication rate for the procedure is about one in one hundred, serious complications are rare. The rate for complications requiring hospitalization is only about one in 2000. And the mortality rate is one in 100,000, which is about twenty-five times less risky than carrying a pregnancy to term. There is no evidence in this case that a first trimester suction curettage abortion has ever resulted in a woman’s death in South Carolina.
Physicians in South Carolina, including Dr. Buffkin and Dr. Campbell, also perform medical abortions to terminate pregnancies located outside the uterus (such as in the fallopian tube) during the first six to seven weeks of pregnancy. A medical abortion is an even safer procedure than the suction curettage procedure. It involves the performance of a routine blood test to measure the patient’s hormone levels, followed by the injection of a drug (methotrexate) into the patient’s arm. There is no recovery time after the injection, and only mild vaginal bleeding. Follow-up care consists of rechecking the patient’s hormone levels several days after the injection, and rechecks thereafter at seven-day intervals. Although currently limited in use to the termination of ectopic pregnancies, methotrexate and a second drug, RU-486, are currently being used in research protocols for use in terminating intrauterine pregnancies.
C
Currently, South Carolina does not require licensing of physicians’ offices outside of the abortion context. Furthermore, physicians licensed to practice medicine in South Carolina are not subject to DHEC regulation, but rather are governed by the South Carolina State Board of Medical Examiners. See S.C.Code Ann. §§ 40-47-5 to 40-47-270 (West Supp.1999). The State Board of Medical Examiners handles the examination and licensure of physicians within South Carolina, complaints against physicians, the suspension and revocation of licenses when appropriate, and the imposition of civil penalties and other sanctions against physicians. With the exception of standard building codes imposed by their particular locales, physicians’ offices are not subject to any mandated design and construction requirements. Notably, unlike abortion clinics, physicians’ offices that do not perform five or more abortions per month are not subject to the requirements of Regulation 61-12.
Regulation 61-12 is divided into ten “Parts.” Part I of Regulation 61-12 sets forth “Definitions” and general “Requirements for Licensure” of abortion clinics. Part I defines an abortion as “[t]he use of an instrument, medicine, drug, or other substance or device with intent to terminate the pregnancy of a woman, known to be pregnant, for reasons other than to increase the probability of a live birth, to *179 preserve the life or health of the child after live birth, or to remove a dead fetus.” S.C.Code Ann. Regs. 61-12, § 101(A). Part I defines an abortion clinic as “[a]ny facility, other than a hospital ... in which any second trimester or five or more first trimester abortions per month are performed.” Id. § 101(B).
In order to operate an abortion clinic, the clinic must first obtain a license from DHEC. See id. § 102(A). Prior to the issuance of a license, the abortion clinic must undergo a pre-licensure inspection. See id. § 102(F). Once the initial license is obtained, the abortion clinic must be inspected annually in order to obtain renewal of the license. See id. §§ 102(F), (H). In addition, Regulation 61-12 provides that the abortion clinic is subject to unannounced inspections by DHEC, see id. § 102(F)(1), during which DHEC inspectors “have access to all properties and areas, objects, records and reports, and shall have the authority to make photocopies of those documents required in the course of inspections or investigations.” Id. § 102(F)(2).
Upon a determination by DHEC that an abortion clinic is in violation of “any statutory provision, rule or regulation relating to the operation or maintenance of such facility,” DHEC may deny, suspend, or revoke the license. Id. § 103. In addition, DHEC may assess a monetary penalty up to $5,000 for each violation. See id. § 103(F). The amount of a penalty is based upon the specific provision at issue, which has been preassigned as either a Class I, II, or III violation, with a Class I violation being the most serious. See id.
Part II concerns the “Administration and Management” of the abortion clinic. Section 201 requires an abortion clinic to develop and implement detailed written policies and procedures for the operation of the clinic, which must include, at a minimum, policies and procedures to assure compliance with all federal, state, and local laws which govern the clinic; .the designation of a person to whom responsibility for. operation and maintenance of the abortion clinic is delegated and the establishment of methods for holding the person responsible; personnel policies and procedures, including in-service training requirements; a facility-wide quality improvement program, including statistical summaries and a written plan of implementation; a policy and procedure for patient rights and grievance procedures; functional safety and maintenance policies and procedures; a policy and procedure for incident reporting; and policies and procedures for obtaining informed consent from the patient. See id. § 201(B). In addition, the abortion clinic’s policies and procedures must include a provision for annual review and evaluation of the clinic’s other policies and procedures, as well as for its management and operation. See id.
Section 203 requires an abortion clinic to maintain on file all current policies and procedures concerning the operation of the clinic, memoranda of agreements and credentialing documentation, a copy of Regulation 61-12, annual elevator safety inspections, and annual heating, ventilation, and air conditioning inspection reports. See id. §§ 203(A)-(E).
Section 204 sets forth detailed personnel requirements for each abortion clinic. The abortion clinic must obtain and verify professional and personal background information on every employee, see id. § 204(A), and must develop and implement a written orientation program for new staff members, to include orientation on the clinic’s other policies and procedures, see id. § 204(E). A formal, in-service training program must also be planned and provided for all employees and volunteers, and records kept of attendance. See id. § 204(F). The in-service training of all employees and volunteers must include four specified areas— infection control, fire protection, confidentiality and patient rights, and licensing regulations. See id. Written job descriptions must be prepared and reviewed annually, see id. § 204(G), and a personnel *180 file must be maintained on each employee and contain the employee’s current job description that reflects the employee’s responsibilities and work assignments, documentation of the employee’s orientation, in-service education, appropriate licensure (if applicable) and tuberculin skin testing, see id. § 204(H). Annually, each employee must have a tuberculin skin test or, if previously positive, a chest x-ray to determine whether tuberculosis is present. See id. § 204(B). If tuberculosis is diagnosed, the abortion clinic must provide treatment and investigate employee contacts. See id. Employees and volunteers are also banned from working if they have any infected wounds, boils, sores, acute respiratory infections, or any other contagious disease or illness. See id. § 204(D). In addition, all professional and allied health care staff members must be certified by the American Red Cross or the American Heart Association as capable of performing CPR, although only one such certified person must be with patients when they undergo the abortion procedure and during the recovery period. See id. § 204(C).
Section 205 sets forth requirements for the clinical staff of an abortion clinic, which encompasses all physicians, nurses, and allied health professionals. See id. § 205(A). Abortions may only be performed by physicians licensed to practice medicine in South Carolina and who are also “properly qualified by training and experience to perform pregnancy termination procedures.” See id. § 205(C). The abortion clinic must also obtain and maintain signed, written agreements with at least one physician board certified in obstetrics and gynecology who has admitting privileges at a local hospital which provides obstetrical and gynecological services. See id. All nursing care is required to be under the supervision of a registered nurse licensed in the State of South Carolina, regardless of the presence of a physician in the abortion clinic, and the registered nurse must be “on duty to provide or supervise all nursing care” during preparation, the procedure, recovery, and discharge. .Id. § 205(D). Licensed practical nurses may be employed so long as they work under the supervision and direction of a registered nurse. See id. § 205(E). Ultrasounds may only be conducted by physicians or ultrasound technicians who have documented evidence of completion of a training course in ultrasonography. See id. § 205(F). Finally, the entire clinical staff must participate in quarterly meetings to review and analyze clinical experiences, and minutes must be kept and maintained of each meeting. See id. § 205(B).
Section 209 requires an abortion clinic to “have written policies and procedures to assure the individual patient the right to dignity, privacy, safety, and to register complaints with [DHEC].” Id. § 209(A). A copy of the patient’s rights must be conspicuously displayed, and a copy must be signed by each patient and included in the patient’s medical record. See id. § 209(B).
Part III of Regulation 61-12 sets forth requirements for “Patient Care.” Additional “patient care policies and procedures designed to ensure professional and safe care for patients” must be developed, id. § 301, and must include, but are not limited to, policies and procedures for admission criteria; physician and nurse responsibilities; details regarding the preoperative procedures (including history and physical examinations, special examinations, lab procedures and consultations which will be required, and ultrasonogra-phy procedures); details regarding the actual abortion procedure (including the use of IVs, fluids, analgesia, anesthesia, and tissue examination and disposal); details regarding post-procedure care and recovery room care, including emergency care; provisions for education of the patient, family and others, as appropriate in pre- and post-procedure care; plans for followup care, including arrangements for a post-operative visit and specific instructions in the event of an emergency; pro- *181 eedures for the management and referral of high-risk conditions; procedures for the transfer of patients when needed; procedures for infection control and sanitation (including duties and responsibilities of an infection control committee which are, in turn, charged with the responsibility of developing and implementing specific patient care and administrative policies to investigate, control, and prevent infections in the clinic); and procedures for the registration of fetal death or death certificates. See id. §§ 301(A)-(K).
Section 303 of Regulation 61-12 relates to an abortion clinic’s pharmaceutical services. Section 303 requires every abortion clinic to maintain an emergency supply of drugs and medicines to treat, at a minimum, the following conditions: (1) cardiac arrest; (2) seizure; (3) asthmatic attack; (4) allergic reaction; (5) narcotic toxicity; (6) hypovolemic shock; and (7) vasovagal shock. See id. § 303(A). In addition, Section 303 mandates that the medicines must be prepared in an area that contains a sink and a counter. See id. § 303(D).
Section 304 requires laboratory services to be performed in compliance with the requirements already mandated by the Clinical Laboratory Improvement Amendments of 1988 (CLIA-88), 42 U.S.C. § 263a.[6] See S.C.Code Ann. Regs. 61-12, § 304(A). It further requires the physician to perform a urine pregnancy test (unless fetal heart beats or movements are identified on physical examination), a urinalysis which includes albumin and glucose examination, and a hematocrit or hemoglobin test. See id. § 304(B). In addition, the physician must perform a test to determine Rh factor. See id. If the patient is Rh positive, an additional Du variant test is required. See id. Rh(D) immune globulin must be administered if the patient is determined to be Rh negative. See id. Testing for chlamydia and gonorrhea is mandatory, while testing for syphilis serology and performance of a Papanicolaou (pap) smear must be offered to the patient. See id. § 304(C).
Section 305 provides additional requirements for emergency care. It requires that “[a]ll staff and/or consulting physicians” have admitting privileges at one or more local hospitals that provide appropriate obstetrical/gynecological services or have in place documented arrangements approved by DHEC for the transfer of emergency cases when hospitalization becomes necessary. Id. § 305(A). The abortion clinic must maintain equipment and services to render emergency resusci-tative and life-support procedures pending transfer. See id. § 305(B). And the abortion clinic must notify, in writing, the local ambulance service of the location of the clinic and the nature of the medical problems which may result from abortions. See id. § 305(C).
Section 306 requires an abortion clinic to purchase and maintain specific equipment and supplies, including such items as “[a] bed or recliner suitable for recovery,” oxygen, mechanical suction, resuscitative equipment, emergency medications and intravenous fluids, “[a] clock with a sweep second hand,” sterile suturing equipment and supplies, an adjustable examination light, and soiled linen and waste containers. Id. §§ 306(A)-(I).
Section 307 requires an abortion clinic to make “[ajrrangements ... for consultation or referral services in the specialties of obstetrics/gynecology, anesthesiology, surgery, psychiatry, psychology, clinical pathology and pathology, clergy, and social services, as well as any other indicated field, to be available as needed.” Id. § 307.
Section 308, entitled “Quality Improvement,” mandates a written plan for a quality improvement program for patient care and designation of an individual responsi *182 ble for coordinating the program. See id. § 308(A). Specific requirements include ongoing monitoring and evaluation of “patient care services, staffing, infection prevention and control, housekeeping, sanitation, safety, maintenance of physical plant and equipment, patient care statistics, and discharge planning services.” Id. § 308(B). Evaluation of patient care is required to be “criteria-based, so that certain actions are taken or triggered when specific quantified, predetermined levels of outcomes or potential problems are identified.” Id. § 308(C). The process must incorporate a quarterly review of a minimum of five percent of the medical records per quarter, but not less than five records per quarter shall be reviewed, see id. § 308(D), and must include a means of obtaining input from families of patients if they are “involved in the care and services provided by the facility.” Id. § 308(E). The abortion clinic administrator must review the findings of the program and ensure corrective actions are taken. See id. § 308(F). The program must also identify and establish indicators of quality care, specific to the abortion clinic, that must be monitored and evaluated. See id. § 308(G). Annual review of the results is also required. See id. § 308(H).
Part IV of Regulation 61-12 sets forth requirements for “Medical Records and Reports.” Section 401 begins by setting forth detailed requirements for the preparation and maintenance of medical records, which must include, at a minimum, twenty categories of information. See id. § 401. Section 401 requires a face sheet with patient identification data, including but not limited to, the patient’s name, address, telephone number, social security number, date of birth, the father and mother’s name if the patient is a minor, the husband’s name, and the name, address, and telephone number of a person to be notified in the event of an emergency. See id. § 401(A)(1). The records are required to be kept confidential by the abortion clinic (although no such requirement is imposed upon DHEC inspectors who obtain them) and must be stored for a minimum of ten years. See id. § 402.
Section 403 requires the preparation of additional reports, including a record of every accident or incident occurring in the abortion clinic which involves patients, staff, or visitors. See id. § 403(B). If it results in serious injury, the accident or incident must be self-reported to DHEC. See id. Serious injuries “include, but are not limited to,” accidents and incidents that lead to hospitalization or death (other than of a fetus) and adverse drug reactions. Id.
Part V of Regulation 61-12, entitled “Functional Safety and Maintenance,” requires additional policies and procedures, including, but not limited to, safety rules and practices for personnel, equipment, gases, liquids, drugs, supplies, and services; provisions for investigating accidents on the premises; provisions for disseminating safety-related information to employees and users of the abortion clinic; provisions for syringe and needle handling and storage; and provisions for managing infectious waste in accordance with another DHEC regulation already governing such matters. See id. §§ 501(A)-(B). In addition, the abortion clinic must prepare and post a disaster preparedness plan for evacuation in the event of a fire or other emergency. See id. § 502(A). All parts and portions of the abortion clinic are generically required to be kept “in good repair and operating condition,” and “free of hazards.” Id. § 503(A). In addition, “[a]ll wooden surfaces shall be sealed with a non-lead based paint, lacquer, varnish, or shellac that will allow sanitization.” Id. A written preventive maintenance program must be developed and implemented for patient monitoring equipment and tested in accordance with manufacturer’s specifications, but not less than annually. See id. § 503(B). Records of maintenance and testing must be kept. See id.
Part VI of Regulation 61-12 is entitled “Infection Control and Sanitation.” Part *183 VI requires policies and procedures be established in writing to assure safe and aseptic treatment and protection of all patients and personnel against cross-infection. See id. § 601(A). Part VI also sets forth specific requirements for sterilization, including daily testing of the autoclave and a log of results, as well as periodic calibration and preventative maintenance as necessary, but not less than annually. See id. §§ 602(B)-(C). This part of Regulation 61-12 also requires that the abortion clinic “be kept neat, clean, and free from odors,” id. § 604(A), mandates specific requirements for cleaning methods to be used and prohibits others, and imposes requirements for refuse and waste disposal, see id. §§ 604(A)-(C), 605. Section 606 requires that “[a]ll outside areas, grounds and/or adjacent buildings shall be kept free of rubbish, grass, and weeds that may serve as a fire hazard or as a haven for insects, rodents and other pests,” and that all “[ojutside stairs, walkways, ramps and porches shall be maintained free from accumulations of water, ice, snow, and other impediments.” Id. § 606.
Part VII of Regulation 61-12, entitled “Fire Protection and Prevention,” provides detailed requirements for firefighting equipment and systems, an evacuation plan, training of employees in the evacuation plan, mandatory fire drills at least once every three months, maintenance of fire equipment, and maintenance of records proving compliance with the provisions. See id. §§ 701-03.
Part VIII of Regulation 61-12 sets forth detailed requirements for the “Design and Construction” of abortion clinics. There is no grandfathering provision (unlike other DHEC regulations governing medical and patient care facilities) — rather, all abortion clinics must be in full compliance within two years. See id. § 804. The requirements are set forth in detail, rendering a summary of them unproductive. Of note, Part VIII governs the number and size of procedure and recovery rooms, specifies the design and equipment required in toilet rooms, regulates the direction of the air flow within the sterilization rooms, mandates a minimum width for doors and corridors, sets forth specific requirements for heating and air conditioning (the unit must be capable of maintaining a temperature between seventy-two and seventy-six degrees), regulates the abortion clinic’s air supply and exhaust, regulates design criteria for abortion clinic entrances, sets forth specific requirements for the janitor’s closets, and specifies the corridor glazing materials, wall finishes, wall bases, and interi- or finish materials that must be present. See id. §§ 807(A)-(Y).
Part IX of Regulation 61-12 sets forth additional “Prerequisites for Initial Licen-sure” of the abortion clinic, including plan and construction approval by DHEC, and specifies the documentation required to be submitted with the abortion clinic’s initial application for licensure. See id. Part IX(A)-(B). Part X of Regulation 61-12, entitled “General,” states in its entirety that “[cjonditions arising that have not been addressed in these regulations shall be managed in accordance with the' best practices as interpreted by the Department.” Id. Part X.
D
As noted earlier, prior to 1995, the State of South Carolina only required licensing of physicians’ offices or other facilities in which second trimester abortions were performed. See S.C. Ann. §§ 44-41-20(b), -70(b) (Law.Co-op.1995). Effective, January 3, 1995, Chapter 41 of Title 44 was amended as follows:
(A) A facility in which any second trimester or five or more first trimester abortions are performed in a month must be licensed by [DHEC] to operate as an abortion clinic and . must comply with the provisions of Article 3 [the Woman’s Right to Know Act].
(B) The department shall promulgate regulations concerning sanitation, *184 housekeeping, maintenance, staff qualifications, emergency equipment and procedures to provide emergency care, medical records and reports, laboratory, procedure and recovery rooms, physical plant, quality assurance, infection control, and information on and access to patient follow-up care necessary to carry out the purposes of this section.
Id. § 44-41-75 (West Supp.1999). Pursuant to this enabling legislation, DHEC promulgated Regulation 61-12.
After the legislation requiring licensure of abortion clinics was passed, Alan Samu-els (Samuels) of DHEC was charged with the responsibility for supervising the drafting and promulgation of Regulation 61-12. Although Samuels has some experience in health care administration, he has received no formal medical training or education. Upon completion of his college education, Samuels served in the United States Army for twenty-four years, where he served with the adjutant general corps and the medical services corps as a personnel officer and hospital inspector. After leaving military service, Samuels began employment with DHEC, where his duties consisted of inspecting various types of health care facilities for compliance with existing regulations. He was eventually promoted to the position of director of DHEC’s Health Licensing Division, and now is retired.
Although Samuels provided some input and edits during the drafting process, he did not personally draft any portions of Regulation 61-12. Rather, he delegated the primary drafting responsibility to George Moore (Moore), who was the Director of Outpatient and Home Care within DHEC’s Division of Health Licensing. Samuels testified that, when Regulation 61-12 was promulgated, he knew very little about abortion procedures or the differences between first trimester and second trimester abortions. The record reflects that Samuels conducted no meaningful study or research into the differences between a first and second trimester abortion, and conducted no meaningful inquiry into what regulatory requirements were appropriate for facilities performing only first trimester abortions.
Like Samuels, Moore has some education and experience with hospital administration, but has received no formal medical training or education. After receiving an undergraduate degree, Moore joined the United States Army where he served twenty-five years. He spent the early part of his service in the adjutant general corps performing general administrative duties, after which time he transferred to the medical services corps where he performed administrative duties associated with health care facilities and hospitals. During his service, Moore received a master’s degree in hospital administration. Upon his retirement from military service in 1988, Moore began employment with DHEC, inspecting hospitals and nursing homes for compliance with existing regulations. He was later promoted to Director of Outpatient and Home Care within the Division of Health Licensing, the position he held when Samuels asked him to assume primary responsibility for the drafting of Regulation 61-12.
In preparation for drafting Regulation 61-12, however, Moore took no meaningful steps to educate himself about first trimester abortions, how they differed from second trimester abortions, or what requirements would be appropriate for a facility which performed only first trimester abortions.
For assistance with Parts VII and VIII of Regulation 61-12, Moore turned to William Lafferty (Lafferty), who was the Director of Health Facilities Construction with DHEC. Like Samuels and Moore, Lafferty has received no formal medical training or education. In drafting these portions of the regulations, Lafferty made no effort to determine whether the requirements were medically appropriate for facilities performing only first trimester abortions. Lafferty also approached the *185 design and construction requirements from the standpoint of new construction requirements and anticipated that existing facilities would be grandfathered. The decision to include a mandatory two-year compliance provision in that portion of Regulation 61-12 instead of a grandfather provision was not made by Lafferty.
According to Moore, the preexisting South Carolina regulation governing second trimester abortions was utilized as a starting point for the new regulation, and many of the additional provisions of Regulation 61-12 were simply adopted or derived from DHEC regulations governing other types of health care facilities. They included regulations governing ambulatory surgical centers, renal dialysis facilities, community residential care facilities, day care facilities for adults, outpatient facilities for chemically dependent persons, habitation centers for the mentally retarded, residential treatment facilities for children and adolescents, nursing homes, and facilities providing home health care and hospice services. According to the DHEC officials, DHEC sought to standardize its regulations governing medical facilities and medical care so that the licensing requirements would have consistent wording, and to codify existing departmental practices. According to the DHEC officials, this attempt to standardize its regulations and to codify existing practices included DHEC’s desire to grant its inspectors the authority to copy medical records in all medical facilities. According to Moore, departmental practice currently allows the copying of medical records during a complaint investigation. Moreover, Moore testified that DHEC would maintain the confidentiality of the records even though there is no provision in Regulation 61-12 that mandates such confidentiality.[7]
Although the DHEC officials testified that they primarily utilized existing South Carolina regulations as the basis for drafting Regulation 61-12, there is evidence in the record that the DHEC officials consulted other points of reference. First, Moore obtained copies of abortion regulations from North Carolina and Tennessee, though he did not speak with anyone in those states about the regulations or how they had affected maternal health. Second, Moore reviewed standards and guidelines issued by the Planned Parenthood Federation of America, Inc. (Planned Parenthood), the National Abortion Federation (NAF), and the American College of Obstetricians and Gynecologists (ACOG). The standards and guidelines published by Planned Parenthood, NAF, and ACOG are not mandated standards of care which can or should be imposed on licensed physicians. Rather, they are guidelines which should be followed with due regard for the medical judgment of the treating physician and the special needs of the patients that they serve.
During the drafting process, the general counsel of ACOG wrote a letter to DHEC expressing concern that the requirements of Regulation 61-12 would not enhance patient well-being or safety and offering DHEC the assistance of ACOG in the drafting of an appropriate regulation. The DHEC drafters declined ACOG’s assistance.
After an initial draft of Regulation 61-12 was completed, Moore requested limited input and comments from two medical personnel associated with DHEC. The first, Dr. Richard Goodrich (Dr. Goodrich), is a licensed physician, board certified in obstetrics and gynecology, who practiced in Zanesville, Ohio until he retired. After his retirement, he moved to South Carolina and became a consultant with DHEC in the area of maternal and child health. During his medical practice, however, Dr. Goodrich performed only *186 two abortions, both of which were due to medical complications. Furthermore, Dr. Goodrich was not asked to and did not draft any portion of Regulation 61-12. Rather, he was only asked to review discrete portions of the regulation dealing exclusively with medical events and medical testing, and he conducted no review of and provided no input on the majority of the regulatory requirements. Although he is of the opinion that the portions of Regulation 61-12 that he reviewed are appropriate medical standards of care, he testified that the same standards would be appropriate for physicians’ offices in which comparable obstetrical and gynecological surgical procedures are performed. Dr. Goodrich further testified that he did not recommend Regulation 61-12’s requirement of physician qualifications beyond state licensure, and acknowledged that he did not know how the required “training and experience” qualifications could be determined under the regulation. Dr. Goodrich also interpreted Regulation 61-12’s requirement that a registered nurse be “on duty” as requiring that a registered nurse have ultimate responsibility, and not that a registered nurse should or needs to be on the premises at all times. Dr. Goodrich further testified that, while he has no specific experience with medical abortions, it would not be his intent to cover the provision of medical abortions under the regulation. He acknowledged, however, that the regulation as drafted would in fact cover such abortions. Finally, Dr. Goodrich testified that he is aware of no existing problem with abortion providers in South Carolina and has no opinion as to how the cost and availability of abortions affect women’s health issues.
Moore also sought some limited input from Robert Lawyer, R.N. (Lawyer), who was Director of Nursing for DHEC. Lawyer received his bachelor of science degree in nursing while in the United States Army, and later received a masters degree in health services management and business administration. He has some experience with providing nursing care for first and second trimester abortions performed in a military hospital. After retiring from the Army in 1989, Lawyer began working with DHEC. He is currently nurse manager with the Division of Health Licensing, where his primary duty is the inspection of various health care facilities for compliance with existing regulations. He too was asked by Moore and Samuels to review and provide input concerning discrete portions of Regulation 61-12, primarily those governing nursing care. Lawyer is of the opinion that, for first trimester abortions, a registered nurse should either personally monitor the patient or supervise all patient care, unless the physician is present in the abortion clinic and available to come to the recovery room if necessary. Unlike Dr. Goodrich, however, he interprets Regulation 61-12 as requiring the “on duty” registered nurse to be on the premises. In formulating his opinion, Lawyer did not conduct any research on abortion practices in South Carolina, nor did he consult with nursing professionals who specialize in abortion procedures. Lawyer testified that while he is aware that Regulation 61-12 would apply to facilities performing only medical abortions, he has no knowledge of what nursing skills are required in the context of medical abortions or whether they would require a registered nurse as opposed to a licensed practical nurse.
With the exception of these limited consultations with medical personnel associated with DHEC, the drafters of Regulation 61-12 did not seek any input from medical professionals during the drafting process and rejected ACOG’s offer of assistance. As some support for the text of Regulation 61-12, the defendants contend that the drafters conducted an inspection of Planned Parenthood’s abortion clinic in Columbia, South Carolina and determined that the clinic met the great majority of Regulation 61-12’s requirements. The evidence credited by 'the district court, however, reveals that the drafters simply toured the clinic and, during one such visit, *187 may have spoken briefly to a Planned Parenthood physician. There is no evidence that the physician was asked to comment upon the regulatory requirements or whether they were medically necessary for first trimester abortions. Moreover, there is no evidence in the record to support a finding that DHEC received any meaningful input from Planned Parenthood physicians prior to or during the early stages of the drafting process.
After the initial drafting process was concluded, DHEC issued a proposed regulation and held public hearings as mandated by South Carolina law. Some of the suggestions made during this public comment period resulted in changes to Regulation 61-12, including some suggestions made by Planned Parenthood and the plaintiffs in this case.
On January 23, 1996, DHEC submitted Regulation 61-12 to the South Carolina legislature for approval as required by South Carolina law. Because the legislature took no action on Regulation 61-12 within 120 days after its submission, it became effective automatically upon publication in the State Register on June 28, 1996.
E
Based on the evidence presented at trial, the district court made detailed findings concerning Regulation 61-12 and its probable effect on the health of women in South Carolina, the cost of obtaining a first trimester abortion in South Carolina,, and the availability for obtaining a first trimester abortion in South Carolina. First, based on the evidence in the record, the district court found that the first trimester suction curettage abortion is one of the safest surgical procedures that can be performed. The procedure lasts approximately two to five minutes and has a low overall complication rate. Suction curettage abortions can be, and are currently being, safely performed in physicians’ offices and outpatient clinics, except where the patient has particular medical conditions that would require the procedure to be performed in an ambulatory surgical center or hospital. Medical abortions are also quick medical procedures that can be safely performed in a physician’s office or outpatient clinic. See Greenville Women’s Clinic, 66 F.Supp.2d at 718.
Second, the district court found that physicians’ offices and clinics that provide less than five first trimester abortions per month perform identical procedures to those which provide five or more first trimester abortions per month, and the risk to the patient undergoing the abortion procedure is identical. See id.
Third, the district court found that first trimester suction curettage abortions are comparable in terms of risks, duration, and invasiveness to a variety of obstetrical and gynecological surgical procedures which are frequently performed in physicians’ offices in South Carolina. These would include suction curettage procedures performed on women who have experienced an incomplete spontaneous abortion, dilation and curettage procedures, endometrial biopsies, hysteroseopies, and insertion of intrauterine devices for birth control. See id.
Fourth, the district court found that first trimester suction curettage abortions are also comparable in terms of risks, duration, and invasiveness to a variety of non-obstetrical/gynecological surgical procedures that are frequently performed in physicians’ offices in South Carolina. These would include the removal of subcutaneous lipomas and cysts, minor breast biopsies, and the removal of implanted ports and catheters which have been inserted into large veins in the neck and collarbone region for use in administering chemotherapy and dialysis. See id.
Fifth, the district court found that South Carolina is not currently experiencing a public health problem related to the provision of first trimester abortions by licensed physicians, nor was the state experiencing such a problem when Regulation 61-12 *188 was promulgated. The district court found no evidence that the plaintiffs or any other abortion providers in South Carolina are providing inadequate care to women seeking abortions or that the rate of complications from abortions performed in South Carolina is greater than the national average. On the contrary, the district court found that South Carolina has experienced a similar, if not lower, average complication rate. See id. at 718-19.
Sixth, the district court found that, although the principal draftsmen of Regulation 61-12 have some expertise in hospital and health care administration, they have no training or education in the provision of hands-on medical care and little knowledge of the medical needs of women seeking first trimester abortions in South Carolina. See id. at 719. The district court found that they engaged in virtually no research, investigation, or other efforts to determine what types of requirements would be necessary or advisable for the abortion procedure, or what types of requirements would further or hinder the state’s interest in maternal health. Nor did DHEC officials possess or seek information concerning the present safety of first trimester abortions or the relative risks associated with the procedure. See id.
Seventh, the district court found that, despite their admitted lack of medical knowledge in general and of abortion procedures in particular, the drafters of Regulation 61-12 sought only minimal input and assistance from knowledgeable medical experts during the drafting process, choosing to rely solely upon the limited review and advice of Dr. Goodrich and Lawyer as to discrete portions of the regulation. See id. Furthermore, DHEC either rejected or ignored an offer by ACOG to assist in the drafting process. Although DHEC was under no legal obligation to consult with ACOG or to accept their assistance during the drafting process, the district court found that ACOG is unanimously considered to be a well-respected medical organization dedicated to improving the standard of health care in the field of obstetrics and gynecology. See id. According to the district court, DHEC’s rejection of ACOG’s assistance further demonstrated DHEC’s lack of interest in ensuring that Regulation 61-12 actually met the proffered goal of promoting maternal health and is consistent with the testimony of the DHEC witnesses that such a goal was not their primary motivation during the drafting process. See id.
Eighth, the district court found that, although it is uncontroverted that first trimester abortions are significantly less risky to the health of women than second trimester abortions, an existing South Carolina regulation governing second trimester abortions was utilized as a starting point for Regulation 61-12. With the exception of Section 309 of Regulation 61-12 which specifically pertains to second trimester abortions,[8] the DHEC drafters drew no distinction between first and second trimester abortions in the text of the regulation. In addition, the DHEC drafters admitted that virtually no such distinctions were considered during the drafting process. See id.
Ninth, the district court found that, instead of attempting to tailor Regulation 61-12 to the particularized medical needs of women seeking first trimester abortion services in South Carolina, DHEC’s goal during the drafting process was to standardize its health care and facility regulations and to codify existing departmental practices. See id. at 719-20. According to the district court, to the extent this was done, it was done without any meaningful inquiry or assessment as to whether the requirements would further the state’s interest in maternal health and without as *189 sessing whether first trimester abortions were comparable to the -procedures performed in the other facilities regulated by DHEC. See id. at 720. The district court further found that clinics that provide first trimester abortions provide services that are significantly less risky, invasive, and lengthy than the services offered in ambulatory surgical centers, yet many of the requirements of Regulation 61-12 are as stringent, or in some respects more stringent, than those imposed upon ambulatory surgical centers.[9] See id.
Tenth, the district court found that Planned Parenthood, NAF, and ACOG standards and guidelines relied upon in part by DHEC are recommendations by the respective organizations and are not fairly characterized as mandated standards of care which can or should be imposed upon licensed physicians as regulatory requirements. Rather, they are guidelines which should be followed with due regard for the medical judgment of the treating physicians and the special needs of the patients they serve. Even if some of the existing guidelines could, in isolation, be appropriate matters for regulation, the district court found that Regulation 61-12 imposes requirements which greatly exceed the guidelines. See id.
Eleventh, the district court found that, in imposing the detailed requirements of Regulation 61-12, the DHEC drafters also failed to take any meaningful steps to evaluate the costs of compliance or its impact upon the availability of abortion services in South Carolina. See id. Based upon the evidence presented, the district court found that Regulation 61-12 will significantly increase the cost of abortion services in South Carolina. See id. The district court found that this increase in the cost of abortion services will delay a significant number of women from obtaining the procedure and, in some eases, result in their inability to obtain the procedure. See id. The district court further found that, as a pregnancy advances, the medical risks associated with abortion increase, and a full term pregnancy and childbirth is much more risky to the physical health of a woman than a first trimester abortion. See id.
Twelfth, the district court found that Regulation 61-12 contained a myriad of detailed and costly provisions that were medically unnecessary and, thus, were neither designed to further the health of women seeking first trimester abortions nor likely to accomplish this goal. For example, with respect to Part I of Regulation 61-12, the district court observed that its definition of an “abortion” included medical abortions currently used to terminate ectopic pregnancies. See id. at 721. However, all of the evidence in the record, including the testimony of Dr. Goodrich, suggested that Regulation 61-12’s stringent requirements were medically unnecessary for a physician or abortion clinic that performed only medical abortions.
With respect to Part II, the district court found that this portion of Regulation 61-12 is permeated with unnecessary requirements governing physician qualifications, staffing, and staff training. See id. The district court observed that Regula *190 tion 61-12 requires physicians and clinics to hire a registered nurse to supervise all nursing care in the abortion clinic regardless of the fact that a licensed physician is present in the clinic to supervise all medical care, including nursing care. See id. The district court found that it is within accepted medical practice, both within the abortion context and in physicians’ offices performing comparable surgical procedures, for a physician to hire licensed practical nurses (who command a lower salary than registered nurses) so long as they act under the supervision of the attending physician. See id. The district court found that the defendants offered no persuasive reason why a physician could not supervise the nursing care of patients during the recovery process simply because the physician may be in another room for a brief period of time. See id. In making this finding, the district court recognized that even DHEC’s own medical consultant, Dr. Goodrich, opined that a registered nurse need not be on the premises to supervise care — only that the nurse have overall supervisory duties. See id.
Also with respect to Part II, the district court found that Part IPs requirement that all abortion clinic health care personnel receive tuberculin skin testing is medically unnecessary in view of the fact that DHEC has not required such testing of all health care personnel and did not offer any justification for arbitrarily requiring this testing of all abortion care workers, but not all other health care workers. See id. at 722.
The district court also found that Regulation 61-12’s requirement that all allied health care personnel in abortion clinics receive CPR training, as opposed to having one qualified person at the clinic at all times, was medically unnecessary in view of the fact that this requirement is imposed solely upon abortion providers who perform, according to all of the witnesses, one of the safest surgical procedures that is performed in this country, and DHEC did not offer any justification for arbitrarily imposing this requirement. See id.
With respect to Part III, the district court found that the level of policies and procedures required by this part, as well as the extensive in-service training requirements and other policies required in Part II, are costly endeavors unsubstantiated by a medical need. See id. The district court observed that such requirements may be appropriate for large medical care facilities with large staffs that do not interact on a daily basis. See id. However, according to the district court, Regulation 61-12 arbitrarily imposes it upon every clinic and every physician’s office which performs five or more first trimester abortions per month — regardless of the number of staff or hours of operation. See id.
The district court also found that it was medically unnecessary to have every woman undergo (and pay for) testing for certain sexually transmitted diseases (but not others), without regard to whether such tests are medically indicated and indeed even when the physician determines that they are not, simply because the woman has chosen to obtain a first trimester abortion from a physician who performs them on a regular basis.[10] See id. The district court further found that Section 307’s requirement that abortion providers have “consulting” arrangements with various specialists before they can obtain a license to operate is medically unnecessary and unduly burdensome because no evidence was presented relating to why licensed physicians are not capable of exercising appropriate discretion in recognizing and acting upon the medical needs of their patients in this regard. See id. at 722-23.
*191 Also with respect to Part III, the district court found that Regulation 61-12 inexplicably imposes requirements concerning access to emergency drugs which are not imposed upon any other physicians. See id. at 723. The district court also found that the equipment and supplies required by Regulation 61-12 will also increase the costs of providing abortions in South Carolina, and require equipment unnecessary for the safe performance of the first trimester abortion procedure. See id.
With respect to Part IV, the district court found that this part of Regulation 61-12 was particularly troubling. For example, the district court found that the requirement that a woman seeking an abortion provide the name of her spouse in addition to an emergency contact is a medically unnecessary requirement which imposes a substantial obstacle in the path of a woman who, for personal reasons, may not wish to disclose this information. See id. The district court also found that, although the abortion clinic was required to keep patient records confidential, nothing prohibited DHEC from publicizing these records once it obtained them pursuant to an inspection. See id. at 702.
With respect to Part VIII, the district court observed that this part of Regulation 61-12 imposed extensive and detailed design and construction requirements for abortion facilities, which far1 exceed building code requirements applicable to other physicians’ offices, including those that perform identical and comparable procedures. See id. at 723. The district court found that these extensive requirements, while perhaps appropriate for a hospital or large ambulatory surgical center, are not justified by expected medical benefits to the women undergoing the relatively safe, first trimester suction curettage abortion in a small physician’s office or clinic. See id.
Also with respect to Part VIII, the district court found that additional requirements, which were advanced as unique to the medical field, had no justification in medical necessity. For example, the district court found no evidence supporting a need for an abortion clinic to install additional bathroom equipment and emergency call buttons or that it have a recovery area separate from the procedure area. See id. at 724. The district court further found that no credible evidence was presented demonstrating that physicians should be required to widen their doors and corridors to a width sufficient to accommodate both an ambulance stretcher and a person walking alongside to perform cardiopulmonary resuscitation, particularly given the unanimous testimony that a first trimester abortion is a relatively safe procedure with infrequent complications. See id. The district court found no evidence that this need had ever arisen from the performance of a first trimester abortion in South Carolina or elsewhere. See id. Finally, the district court observed that physicians performing surgical procedures of comparable invasiveness and risk are not required to renovate their- offices to meet a similar requirement. See id.
With respect to Part IX, the district court found that this part of Regulation 61-12 required numerous certifications and laboratory test results concerning various parts of the abortion clinic (such as the carpets and draperies) without any evidence that the these requirements would further the goal of protecting women’s health in South Carolina. See id.
With respect to Part X, the district court observed that, in conjunction with Section 103(C), Part X grants to DHEC unfettered power to “manage[ ]” abortion providers “in accordance with the best practices as interpreted by the Department,” S.C.Code Ann. Regs. 61-12, Part X, and to cite providers with a Class III violation and penalty if DHEC observes a condition deemed to be “against the best practices as interpreted by the Department,” id. § 103(C). The district court found that Part X imposed upon abortion providers the additional burden of determining and complying with standards or *192 practices not specified in the regulation, but which DHEC may in the future find to be “best” for an abortion clinic. See Greenville Women’s Clinic, 66 F.Supp.2d at 724.
Finally, the district court found that a first trimester suction curettage abortion in South Carolina currently costs between $325 and $480, depending on the gestational age, the type of sedation or anesthesia needed, and the medical testing indicated. See id. at 717., The district court further found that Regulation 61-12 would raise the cost of each abortion performed by the plaintiffs in the following ranges:[11]
(1) For CWMC, the cost will increase between $36.48 and $75.03;
(2) For Dr. Lynn’s Greenville practice, the cost will increase between $93.09 and $170.39;
(3) For Dr. Lynn’s Beaufort practice, the cost will increase between $115.67 and $367.50;
(4) For GWC, the cost will increase between $22.68 and $32.39.[12]
See id. The district court found that the substantial alterations that Dr. Lynn would have to undertake to bring his Beaufort practice in compliance with Regulation 61-12 will likely force him to close his practice, thereby eliminating the availability of abortions in this area of South Carolina.[13] See id. The district court also found that the increased cost of providing abortions and/or the closure of the only abortion clinic in one area of a state resulting from Regulation 61-12 will prevent a significant number of women from obtaining an abortion or, at a minimum, delay them from obtaining the abortion, both of which carry increased risks to the health of women.[14] See id. at 718. The district *193 court found that, as a pregnancy advances, the medical risks associated with an abortion procedure increase, and a full term pregnancy is more risky to the physical health of a woman than a first trimester abortion. See id. at 720.
F
Based on the findings of the district court summarized above, the district court concluded that Regulation 61-12 violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. See id. at 724-43. With respect to the Due Process Clause, the district court held that Regulation 61-12 failed to pass constitutional muster under either the facial invalidity standard set forth in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), or the undue burden test set forth in Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality joint opinion of O’Connor, Kennedy, and Souter, J.J.). See Greenville Women’s Clinic, 66 F.Supp.2d at 727-37. With respect to the undue burden standard set forth in Casey, the district court held that Regulation 61-12 did not serve and was not designed to serve the state’s interest in maternal health. See id. at 730-35. To the contrary, the district court concluded that Regulation 61-12 would likely harm the health of women in South Carolina. See id. Accordingly, the district court concluded that Regulation 61-12 was unconstitutional under Casey. See id. at 735. The district court also concluded that even if Regulation 61-12 furthered the state’s interest in maternal health, the burdens imposed by Regulation 61-12 upon abortion patients and providers constituted an undue burden on a woman’s right to have an abortion prior to viability. See id. at 735-43. With respect to the standard set forth in Salerno, the district court concluded that Regulation 61-12 was unconstitutional in all of its applications and, therefore, could not stand under Salerno. See id. at 736-43.
With respect to the Equal Protection Clause, the district court held that Regulation 61-12 violated the Equal Protection Clause under both the strict scrutiny test and the more lenient rational basis test. See id. at 737-43. With respect to the rational basis test, the district court held that Regulation 61-12 failed that test because it singles out physicians and abortion clinics performing five or more first trimester abortions per month from other physicians and clinics performing four or less first trimester abortions per month and/or other virtually identical procedures and places additional and onerous burdens upon physicians and abortion clinics which are neither justified by actual differences nor rationally related to the state’s legitimate interest in protecting the health and safety of women seeking first trimester abortions. See id. at 740-43.
Finally, the district court concluded, in light of both South Carolina law and the text of Regulation 61-12, that Regulation 61-12 was not subject to the doctrine of severability.[15] See id. at 743-44.
II
A
The Due Process Clause of the Fourteenth Amendment states that: “nor shall any State deprive any person of life, liberty, or property, without due process of law.” U.S. Const, amend. XIV, § 1. “Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive *194 persons of liberty, ... the Clause has been understood to contain a substantive component as well, one barring certain government actions regardless of the fairness of the procedures used to implement them.” Casey, 505 U.S. at 846, 112 S.Ct. 2791 (plurality joint opinion of O’Connor, Kennedy, and Souter, J.J.) (citation and internal quotation marks omitted). A woman’s right to have an abortion is recognized as a fundamental right protected by the substantive component of the Due Process Clause of the Fourteenth Amendment. See Roe v. Wade, 410 U.S. 113, 155-66, 98 S.Ct. 705, 35 L.Ed.2d 147 (1973); see also Manning v. Hunt, 119 F.3d 254, 259 (4th Cir.1997).[16]
In Roe, the Supreme Court overturned a Texas statute prohibiting abortions unless an abortion was necessary to save the life of the mother. See 410 U.S. at 117-18, 93 S.Ct. 705. The Roe Court held that the right of personal privacy includes the right to have an abortion, but that the right “is not unqualified and must be considered against important state interests in regulation.” Id. at 154, 93 S.Ct. 705. The Court determined that because abortion is a fundamental right, state abortion regulations should be analyzed under the strict scrutiny standard of review, and are, therefore, valid only if the regulation can be justified by a compelling state interest and if the regulation was narrowly drawn to further only that legitimate state interest. See id. at 155, 93 S.Ct. 705. According to the Court, the state’s interest in preserving and protecting the health of the mother and in protecting potential human life increase in substantiality as the woman approaches term, becoming compelling at some point in the pregnancy. See id. at 162-63, 93 S.Ct. 705.
The Roe Court found that during the first trimester of pregnancy the decision to abort must be left to the wishes of the mother and the judgment of the mother’s physician; that during the time after the first trimester but before viability of the fetus, the state could regulate the abortion decision in ways reasonably related to maternal health; and that after viability, the state could regulate or proscribe abortion except when necessary to preserve the life or health of the mother. See id. at 164-65, 93 S.Ct. 705.
Since Roe, the Court has struggled to formulate a precise standard for reviewing facial challenges to abortion regulations. In Salerno, the Court explained that
[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that[an Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an “over-breadth” doctrine outside the limited context of the First Amendment.
481 U.S. at 745, 107 S.Ct. 2095. Thus, under Salerno, a facial challenge to a statute will fail if the statute has any constitutional application. Following Salerno, the Supreme Court applied Salerno’s “no set of circumstances” test in a few pre-Casey cases involving abortion statutes. See, e.g., Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).
In Casey, however, the Court held that an abortion law is unconstitutional on its face if, “in a large fraction of the cases in which '[the statute] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion.” 505 U.S. at 895, 112 S.Ct. 2791. Although Casey did not expressly overrule Salerno, it is inconsistent with Salerno. Under Salerno, no factual showing of unconstitutional application can render a law unconstitutional *195 if it has any constitutional application. Under Casey, a factual showing of unconstitutional application in “a large fraction of the cases” where the law applies can render a law unconstitutional, even if it has some constitutional application.
In Casey’s wake, many circuit courts held that Casey displaced Salerno in the abortion context. See, e.g., Planned Parenthood v. Lawall, 180 F.3d 1022, 1027 (9th Cir.) (“In light of our previous suggestion, combined with the great weight of authority holding that Casey has overruled Salerno in the context of facial challenges to abortion statutes, we apply Casey’s undue burden standard in determining the facial constitutionality of [the statute at issue].”), amended by 193 F.3d 1042 (9th Cir.1999); Women’s Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 193-96 (6th Cir.1997) (concluding that Salerno is inapplicable to facial challenges to abortion regulations and applying Casey’s undue burden standard), cert. denied, 523 U.S. 1036, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996) (noting the difference between Casey and Salerno and applying Casey’s undue burden standard to facial abortion challenge); Planned Parenthood v. Miller, 63 F.3d 1452, 1458 (8th Cir.1995) (choosing to follow “what the Supreme Court actually did — rather than what it failed to say— and apply the undue-burden test” to facial abortion challenge); Casey v. Planned Parenthood, 14 F.3d 848, 863 n. 21 (3d Cir.1994) (noting that Supreme Court in Casey “set a new standard for facial challenges to previability abortion laws”). The Fifth Circuit has applied the Salerno test to a facial abortion challenge after Casey, see Barnes v. Moore, 970 F.2d 12, 14 (5th Cir.1992), but its application of Salerno has not been consistent, see Sojourner T. v. Edwards, 974 F.2d 27, 29-31 (5th Cir.1992) (striking down statute banning abortions as clearly unconstitutional under Casey, even though it permitted abortions to save the life of the mother and, therefore, arguably passed constitutional muster under Salerno), and the Fifth Circuit has yet to resolve the inconsistency. See Okpalobi v. Foster, 190 F.3d 337, 354 (5th Cir.1999) (noting inconsistency but declining to address it because challenged law failed under both Casey and Salerno).
However, our circuit never resolved the Salemo/Casey question, despite what the majority might have one believe. See ante at 164-65. In Manning, we applied the Salerno standard of review to an abortion statute, but the plaintiffs did not challenge its applicability. See 119 F.3d at 268 n. 4. In dicta, however, the court suggested that we would nonetheless apply the Salerno standard until the Supreme Court explicitly overruled it, stating that
Kit is not the province of the court of appeals to predict how the Supreme Court will ultimately rule on an issue. Casey does not specifically overrule Salerno. At the moment, the most that can be said is that three Justices have indicated a desire to do so. Until the Supreme Court specifically does so, though, this Court is bound to apply the Salerno standard as it has been repeatedly applied in the context of other abortion regulations reviewed by the Supreme Court.
Id.; see also Planned Parenthood v. Cam-bios, 155 F.3d 352, 381 n. 14 (4th Cir.1998) (en banc) (noting the Manning dicta but not deciding the question), cert. denied, 525 U.S. 1140, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999); id. at 389 n. 2 (Michael, J., concurring in the judgment) (asserting that Casey’s, undue burden test must be applied to facial challenges to abortion restrictions).
The Salemo/Casey question was finally resolved by the Supreme Court in Stenberg v. Carhart, — U.S. -, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In that case, a Nebraska physician brought a facial challenge to Nebraska’s “partial birth” abortion statute. As interpreted by the Supreme Court, the Nebraska statute banned the performance of second trimester dilation and extraction (D&X) abor *196 tions, commonly referred to as “partial birth abortions,” and the performance of dilation and evacuation (D&E) abortions, the most commonly used method for performing previability second trimester abortions. The Supreme Court applied Casey and concluded that the Nebraska statute was unconstitutional for two independent reasons. First, the Court concluded that the Nebraska statute was unconstitutional because the statute lacked any exception for the preservation of the health of the mother and the record evidence disclosed that, in some circumstances, a D&X abortion would be the safest abortion. See Sternberg, — U.S. at-, 120 S.Ct. at 2609-13. Second, the Court concluded that, because the Nebraska law applied to the performance of D&E abortions, the most commonly used method for performing previability second trimester abortions, the resulting fear of prosecution, conviction, and imprisonment felt by physicians who perform D&E abortions amounted to an undue burden on a woman’s right to have an abortion. See id. —U.S. at-, 120 S.Ct. at 2613-17.
In this case, the district court did not resolve the Salerno/Casey question. See Greenville Women’s Clinic, 66 F.Supp.2d at 726-27. Instead, the district court analyzed Regulation 61-12 under both standards and held that Regulation 61-12 failed to pass constitutional muster under either the Salerno or Casey standard. See id. at 727-37. Here, being bound by Sten-berg, I only need to evaluate Regulation 61-12 under the principles set forth in Casey, as contrary to the majority’s intimation, see ante at 164-65, Salerno, in the abortion context, is not recognized as, the law by the current Supreme Court.
In Casey, the Supreme Court established the undue burden test for determining whether a statute restricting abortions could pass constitutional muster. Under Casey, a statute is invalid on its face if it places an undue burden on a woman’s right to have an abortion before the fetus attains viability. See 505 U.S. at 878, 112 S.Ct. 2791. An undue burden exists if the state regulation has the effect of placing a substantial obstacle in the path of a woman’s choice to obtain an abortion before the fetus attains viability. Id. at 877-78, 112 S.Ct. 2791. A statute that creates a substantial obstacle for a large fraction of those women affected by the regulation creates an undue burden and is facially unconstitutional. See id. at 894-95, 112 S.Ct. 2791. Thus, in Casey, the Court rejected Roe’s trimester framework, but left intact a woman’s fundamental right “to choose to have an abortion before viability and to obtain it without undue interference from the state.” Id. at 846, 112 S.Ct. 2791. In reaching this conclusion, the Court recognized that the state’s interests prior to viability “are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman’s effective right to elect the procedure.” Id.
In Casey, the Supreme Court was presented with constitutional challenges to various provisions in a Pennsylvania statute governing informed consent, parental consent, record-keeping and reporting requirements, and a medical emergency exception. See id. at 844, 112 S.Ct. 2791. Thus, the plurality opinion primarily focused on the state’s legitimate interests in the potentiality of human life — holding that to promote this “profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman’s choice is informed, and measures designed to advance this interest will not be invalidated so long as their purpose is to persuade the woman to choose childbirth over abortion” and they do not impose an “undue burden on the right.” Id. at 878, 112 S.Ct. 2791.
Nevertheless, the Casey plurality also provided guidance by addressing the state’s concomitant, and equally legitimate, interest in preserving and protecting the health of women seeking abortion services — of particular relevance to the challenge in this case. Specifically, the Casey plurality held that as
*197 with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.
Id. at 878, 112 S.Ct. 2791 (emphasis added).
The types of burdens that may be imposed by state regulation are varied in nature, but clearly include financial burdens which restrict or prohibit the exercise of the right. As noted by the Casey plurality:
Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where the state regulation imposes an undue burden on a woman’s ability to make the decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.
Id. at 874, 112 S.Ct. 2791; see also id. at 901, 112 S.Ct. 2791. Furthermore, “[n]ot all burdens on the right to decide whether to terminate a pregnancy will be undue.” Id. at 876, 112 S.Ct. 2791. As the Casey plurality noted:
A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman’s free choice, not to hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman’s choice cannot be considered a permissible means of serving its legitimate ends.
Id. at 877, 112 S.Ct. 2791. Accordingly, the court must first determine whether Regulation 61-12 furthers the state’s interest in maternal health, which is the state interest the defendants contend Regulation 61-12 was designed to serve. See id.; id. at 900-01, 112 S.Ct. 2791 (“The collection of information with respect to actual patients [which, under the statute at issue, will remain confidential] is a vital element of medical research, and so it cannot be said that the requirements serve no purpose other than to make abortions more difficult.”). If Regulation 61-12 furthers the state’s interest in maternal health, the court must next determine whether Regulation 61-12 imposes an undue burden on a woman’s right to seek an abortion. See id. at 877, 901,112 S.Ct. 2791.
In this case, a careful review of the record discloses that Regulation 61-12 does not further the state’s interest in maternal health. With respect to whether Regulation 61-12 furthers the state’s interest in maternal health, I note that the Supreme Court has not provided much guidance in this area. However, several $re-Casey cases do provide some insight. For example, in Roe’s companion case, Doe v. Bolton, the Court invalidated a Georgia law requiring that all first trimester abortions be performed in a licensed hospital where the state failed to show that only the hospital environment could ensure the quality of the operation and the protection of the patients. See 410 U.S. at 195, 93 S.Ct. 739.
In Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), the Supreme Court was presented with a challenge to an Ohio ordinance which, among other things, required all second trimester abortions to be performed in a hospital. See id. at 422, 103 S.Ct. 2481. Reaffirming the *198 prohibition against over regulation of a relatively safe surgical procedure, the Court held that the
[s]tate’s discretion to regulate on [the basis of maternal health] does not ... permit it to adopt abortion regulations that depart from accepted medical practice .... If a State requires licensing or undertakes to regulate the performance of abortions during this period, the health standards adopted must be legitimately related to the objective the State seeks to accomplish.
Id. at 431, 103 S.Ct. 2481 (citation and internal quotation marks omitted). The Court then invalidated the ordinance, holding that it “imposed a heavy, and unnecessary, burden on a woman’s access to a relatively inexpensive, otherwise accessible, and safe abortion procedure.” Id. at 438,103 S.Ct. 2481.[17]
From the above discussion, it is evident that the State of South Carolina has a legitimate interest from the outset of pregnancy in protecting the health of women seeking abortions, and that this interest is sufficiently important to allow the state to regulate abortion providers, including providers that limit their services to abortions during the first trimester. See Casey, 505 U.S. at 876, 112 S.Ct. 2791. Furthermore, this interest allows the state to regulate, within the boundaries of Casey and its predecessors, such matters as the qualifications of the person performing the procedure, the facilities in which the abortions are performed, and the availability of medical care after the procedure and in the event of an emergency. See Roe, 410 U.S. at 149-50, 93 S.Ct. 705. However, Casey and its predecessors teach us that health regulations which are unnecessary, ie., not reasonably related to maternal health or which depart from accepted medical practice, cannot withstand constitutional scrutiny and must be invalidated. See Casey, 505 U.S. at 878, 112 S.Ct. 2791; Akron, 462 U.S. at 431, 103 S.Ct. 2481.
In my view, Regulation 61-12 is riddled with unnecessary requirements, i.e., requirements not reasonably related to maternal health or which depart from accepted medical practice. For example, Regulation 61-12’s requirement that each abortion patient be tested for particular sexually transmitted diseases is not an accepted medical practice where there are no symptoms or other accepted medical reasons or risk factors to justify such a test.[18] Also, Regulation 61-12 requires an abortion clinic to perform urine pregnancy tests on all abortion patients, including those whose pregnancy have been confirmed by other means, e.g., ultrasound. In addition, Regulation 61-12 places medically unnecessary administrative requirements on abortion clinics which are clearly inappropriate to medical offices of such small sizes as the plaintiffs’ offices. For example, DHEC has mandated — without regard to the number of staff or size of the abortion clinic — the development of extensive policies and procedures, frequent staff meetings, formal in-service training and required staff certifications, and medical testing of employees which, while probably appropriate for a hospital or a large outpatient surgical center, are unnecessary in a small physician’s office or clinic. Furthermore, there is no evidence in the record demonstrating how Regulation 61-12’s construction and design requirements will further the health *199 of women seeking abortions in South Carolina, and no explanation is offered as to why all of these requirements are so much greater for these clinics than they are for other physicians’ offices performing the same type of procedures.
Another requirement which is not an accepted medical practice is Regulation 61-12’s requirement that a registered nurse, as opposed to a licensed physician, supervise nursing care. There is no evidence in the record to suggest that a physician is not capable of supervising nursing care. In addition, Regulation 61-12 requires that an abortion clinic “be kept ... free from odors” and that all outside areas “be kept free of rubbish, grass, and weeds that may serve ... as a haven for insects, rodents and other pests.” S.C.Code Ann. Regs. 61-12, §§ 604 and 606. However, there is no evidence in the record suggesting that these requirements would ensure the quality of a first trimester abortion procedure or the protection of patients.
The same can be said about Part X of Regulation 61-12 which grants DHEC the authority to impose penalties for any condition which, while not mandated or prohibited by Regulation 61-12, DHEC deems to be “against the best practices” as later defined by DHEC. Id. Part X. Obviously, Part X of Regulation 61-12 subjects physicians to unnecessary uncertainty in the operation of their practices and invites arbitrary enforcement. Finally, it is not an accepted medical practice to permit a state agency, such as DHEC, to enter an abortion clinic, copy records, and disseminate them publicly, but this is precisely what Regulation 61-12 allows.[19]
In summary, Regulation 61-12 does not further the state interest of protecting maternal health. In fact, Regulation 61-12 has the opposite effect. As found by the district court, Regulation 61-12 will substantially increase the cost of abortions in South Carolina because Regulation 61-12 requires unnecessary tests be performed, unnecessary staff be hired, and, in some cases, extensive renovations to existing facilities be made. Because Regulation 61-12 will result in a substantial increase in the cost of obtaining an abortion in South Carolina, a significant number of women will be forced to either delay having an abortion, or forego having one altogether. *200 This, in turn, will result in increased health risks to women seeking abortions. Accordingly, Regulation 61-12 serves no other purpose than to make abortions more difficult to obtain, and, therefore, Regulation 61-12 violates the Due Process Clause of the Fourteenth Amendment. See Casey, 505 U.S. at 877, 112 S.Ct. 2791; id. at 900-01, 112 S.Ct. 2791.
The majority concludes that Regulation 61-12 was designed to further the State of South Carolina’s interest in maternal health largely on the basis that Regulation 61-12 is generally compatible with accepted medical practice governing abortions, more specifically, the guidelines promulgated by ACOG and NAF. See ante at 167-69. The majority’s analysis ignores the significant departures that Regulation 61-12 makes from those guidelines, the attendant costs associated with those departures, and the effect of those costs on the availability of abortions in the State of South Carolina. Regulation 61-12 goes far beyond the recommendations of ACOG and NAF, and, in some cases conflicts with them. Thus, while the ACOG and NAF guidelines address physical plant and equipment needs in abortion clinics, they do not suggest or support the extensive plant and equipment requirements (such as mandating numerous separate rooms or areas, utility sinks, and specific air exchanges, sheltered entryways, special janitor’s closets) included in Regulation 61-12. Similarly, the ACOG and NAF guidelines do not contain any recommendations supporting the staffing requirements imposed by Regulation 61-12. For example, none of the guidelines require that a registered nurse supervise nursing care in an abortion facility if the attending physician is able to supervise that care. In addition, the ACOG and NAF guidelines do not support the testing requirements imposed by Regulation 61-12; specifically, they do not call for any routine testing of abortion patients other than for Rh factor and anemia, and they state that sexually transmitted disease testing should be performed on the basis of risk factors. Likewise, while the ACOG guidelines address the administration of abortion clinics, they do not require the extensive written policies, procedures, and formal meetings required by Regulation 61-12. Also, the ACOG and NAF guidelines forbid the release of any medical information from a patient’s record without the prior consent of the patient, thus conflicting with Regulation 61-12’s mandate that abortion providers permit DHEC to copy and remove patient records. In addition, while the ACOG and NAF guidelines recommend that counseling be offered, Regulation 61-12 requires something very different. It mandates the establishment of relationships with outside specialists in various areas to whom patients can be referred. Finally, it should be noted that the district court found as a fact that the ACOG and NAF guidelines were just that, guidelines. They are not mandates..
The upshot of this discussion is that the departures from the ACOG and NAF guidelines listed above, coupled with many others not discussed, result in a substantial increase in the cost of obtaining an abortion in the State of South Carolina. As noted above, because Regulation 61-12 will result in a substantial increase in the cost of obtaining an abortion in South Carolina, a significant number of women will be forced to either delay having an abortion, or forego having one altogether. Also, the costs will likely force the closure of Dr. Lynn’s Beaufort office, which will result in the elimination of abortion services in that part of South Carolina. Under such circumstances, one must conclude that Regulation 61-12 does not further the State of South Carolina’s interest in maternal health.
Even if Regulation 61-12 furthers the state interest of protecting and preserving the health of women seeking abortions, Regulation 61-12 cannot stand if it imposes an undue burden on a woman’s fundamental right to obtain an abortion, see id. at 877-78, 112 S.Ct. 2791, as a regulation *201 which has “the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.” Id. at 877, 112 S.Ct. 2791. A review of the record makes it clear that Regulation 61-12 will impose an undue burden on the right to obtain an abortion prior to viability. As noted earlier, a first trimester suction curettage abortion in South Carolina currently costs between $325 and $480, depending on the gestational age, the type of sedation or anesthesia needed, and the medical testing indicated. Based on the costs of complying with Regulation 61-12, the district court found that Regulation 61-12 would raise the cost of each abortion performed by the plaintiffs in the following ranges: (1) for CWMC, the cost will increase between $36.48 and $75.03; (2) for Dr. Lynn’s Greenville practice, the cost will increase between $93.09 and $170.39; (3) for Dr. Lynn’s Beaufort practice, the cost will increase between $115.67 and $367.50; and (4) for GWC, the cost will increase between $22.68 and $32.39. See Greenville Women’s Clinic, 66 F.Supp.2d at 717. A significant increase in the cost of obtaining an abortion alone can constitute an undue burden on the right to have an abortion. See Casey, 505 U.S. at 901, 112 S.Ct. 2791 (“While at some point increased cost could become a substantial obstacle, there is no such showing on the record before us.”). It follows that the decreased availability of abortions due to the closure of the only abortion clinic in one area of a state also constitutes an undue burden on the right to have an abortion, as it increases the distance a woman has to travel to obtain an abortion, thereby significantly increasing the time and the cost to obtain an abortion.
Regulation 61-12 will impose a significant increase in the cost of obtaining an abortion in South Carolina, which, in turn, will prevent woman from obtaining abortions. For example, for a woman in Beaufort, South Carolina, the cost of a first trimester abortion will increase, at a minimum, $115.67, or, if Dr. Lynn’s Beaufort practice closes because of Regulation 61-12, it may result in the elimination of abortion services in that part of the state altogether. Also the increased costs of providing abortions resulting from Regulation 61-12 at other facilities throughout South Carolina will prevent a significant number of women from obtaining an abortion or, at a minimum, delay them from obtaining an abortion, thus, resulting in increased health risks to women in South Carolina.
Regulation 61-12 also imposes additional burdens, unrelated to cost, on the right to obtain an abortion. For example, Regulation 61-12 grants DHEC inspectors the right to inspect abortion clinics at will and without limitation; such inspections can be initiated by anonymous complaints. During any such inspection, DHEC inspectors are granted the right to copy confidential patient records, and Regulation 61-12 does not ensure that DHEC will keep these records confidential. Obviously, this requirement would have a chilling effect on a woman’s freedom to choose to have, and a physician’s willingness to perform, an abortion. Another example is Regulation 61-12’s requirement that a married abortion patient disclose her husband’s name. Obviously, this requirement is not necessary for the provision of safe medical care, and there are a host of reasons why a married patient would prefer not to disclose her husband’s name. Cf. Casey, 505 U.S. at 893-98, 112 S.Ct. 2791 (holding that Pennsylvania law requiring spousal notification prior to abortion imposes an undue burden on the right to have an abortion). Thus, this requirement also hinders a woman from obtaining an abortion. Finally, physicians performing five or more first trimester abortions per month must be licensed by the State of South Carolina and be “properly qualified by training and experience to perform” abortions. S.C.Code Ann. Regs. 61-12, § 205(C). However, Regulation 61-12 provides no guidance on the additional credentials required beyond that of a medical *202 license to meet this qualification standard. Thus, physicians who perform five or more first trimester abortions per month operate under a constant fear that they will be declared “unqualified” by DHEC under some vague and amorphous standard. Obviously, this readily apparent fear would have a chilling effect on a physician’s willingness to perform an abortion, thus, resulting in an adverse impact on a woman’s ability to obtain an abortion. Cf. Stenberg, — U.S. at-, 120 S.Ct. at 2617 (“In sum, using this law some present prosecutors and future Attorneys General may choose to pursue physicians who use D&E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform procedures using that method must fear prosecution, conviction, and imprisonment. The result is an undue burden upon a woman’s right to make an abortion decision.”). Under these circumstances, I am simply constrained to conclude that Regulation 61-12 imposes an undue burden on a woman’s fundamental right to obtain an abortion. Cf. Ragsdale v. Turnock, 841 F.2d 1358, 1373-74 (7th Cir.1988) (invalidating portions of a similar licensure regulation which mandated, among other things, detailed physical plant requirements, policies and procedures, and staffing requirements); Birth Control Ctrs., Inc. v. Reizen, 743 F.2d 352, 364-65 (6th Cir.1984) (invalidating detailed, specific regulatory criteria governing the physical layout of abortion facilities, staffing requirements, and equipment requirements).
In its opinion, the majority concludes that Regulation 61-12 does not constitute an undue burden on a woman’s right to obtain an abortion. See ante at 169-72. The pillar supporting the majority’s holding is its observation that the plaintiffs failed to produce evidence demonstrating that the cost increases resulting from the promulgation of Regulation 61-12 would have an adverse effect on a women’s ability to obtain an abortion in South Carolina. See ante at 170-71. This pillar is a transparent facade, at best.
In part, the district court’s finding of an undue burden was premised on the testimony of the plaintiffs’ expert, Dr. Stanley Henshaw. Dr. Henshaw testified that an increase of just $25 can be expected to prevent one or two out of every 100 low-income women seeking an abortion from being able to obtain one. Under Supreme Court case law, this constitutes an undue burden on a woman's right to obtain an abortion. See Casey, 505 U.S. at 894-95, 112 S.Ct. 2791 (invalidating law that imposed substantial obstacle on a large fraction of the one percent of abortion patients who are married and do not voluntarily notify their spouses of the abortion).
Moreover, the cost increases resulting from Regulation 61-12 will likely force Dr. Lynn to close his Beaufort practice. While traveling seventy miles on secondary roads may be inconsequential to my brethren in the majority who live in the urban sprawl of Baltimore, as the district court below and I conclude, such is not to be so casually addressed and treated with cavil when considering the plight and effect on a woman residing in rural Beaufort County, South Carolina.[20]
*203 B
The Equal Protection Clause states in relevant part that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1. The Equal Protection Clause requires that “all persons similarly situated should be treated alike.” City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). However, the Equal Protection Clause’s “promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.” Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Accordingly, “if a law neither burdens a fundamental right nor targets a suspect class,” the legislation will be upheld “so long as it bears a rational relation to some legitimate end.” Id.
Initially, it must be determined what level of scrutiny should be applied to the classifications at issue, which are physicians and abortion clinics that perform five or more abortions per month. The plaintiffs urge the court to apply strict or heightened scrutiny because the classifications penalize the exercise of the fundamental right to have an abortion or, at a minimum, target a suspect or quasi-suspect class. On the other hand, the defendants contend that physicians do not constitute a suspect class for equal protection purposes and do not have a fundamental right to perform abortions. Accordingly, the defendants argue that the court should apply the rational basis test.
Courts addressing the constitutionality of similar types of health care regulations have reached various conclusions under different tests. For example, in Friendship Medical Center, Ltd. v. Chicago Board of Health, 505 F.2d 1141 (7th Cir.1974), the court invalidated abortion service regulations promulgated by the Chicago Board of Health which sought to regulate such things as the design of the medical facility, the type of medical staff and its training, the maintenance of equipment, supplies, and medications, the content of medical records, and the types of medical tests which must be administered to abortion patients. See id. at 1152-53. Applying strict scrutiny, the court invalidated the regulation on both due process and equal protection grounds, because fundamental rights were involved. See id. at 1148-52. With regard to the equal protection analysis, the'court held as follows:
Given the Supreme Court’s acceptance of the medical fact that the mortality rate of women receiving legal abortions is “as low as or lower than the rates of normal childbirth,” ... there would seem to be little justification for extensive governmental regulations, purportedly based on health considerations, for one procedure than the other....
The Chicago Board of Health’s Rules on Abortion Services regulate comprehensively physicians who perform abortions, while at the same tiifie leaving other medical procedures, often much more complex and dangerous in terms of the patient’s health, up to the good judgment of the physician.
Id. at 1152 (quoting Roe, 410 U.S. at 149, 93 S.Ct. 705). Because the defendants offered no sufficiently compelling reason to justify the difference in treatment, the court invalidated the regulations. See id. at 1153. It had previously noted, however, that “on the record before th[e] court there is no basis for determining whether the regulations are even reasonably related to a valid state concern.” Id. at 1150.
*204 The Sixth Circuit has also been called upon to address comprehensive health regulations on several occasions. First, in Mahoning Women’s Center v. Hunter, 610 F.2d 456 (6th Cir.1979), vacated on other grounds, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980), the court affirmed the district court’s decision to invalidate, under the strict scrutiny test, a city ordinance imposing costly medical and building code requirements on first trimester abortion clinics, while leaving unregulated the performance of other medical and surgical procedures. See id. at 460-61.
Next, the Sixth Circuit addressed the constitutionality of a Michigan licensing scheme which required all free-standing surgical outpatient facilities (FSOFs) to comply with staffing, structural, equipment, counseling, consent, and record-keeping requirements in order to obtain a license to operate. See Birth Control Ctrs., Inc., 743 F.2d at 357. Because the licensing scheme applied to abortion clinics, albeit not exclusively, four abortion clinics challenged the scheme on equal protection grounds because it exempted private physicians’ offices where abortions were performed. See id. at 356-57. The court affirmed the district court’s application of the rational basis test as the appropriate standard of review, because the “differentiation between FSOFs and physicians’ private offices did not involve any suspect class nor implicate any fundamental right.” Id. at 358. In particular, the court held that “no suspect classification was involved ... since the state ha[d] chosen to regulate all FSOFs, not just abortion clinics,” and distinguished Mahoning on this basis. Birth Control Ctrs., Inc., 743 F.2d at 358 & n. 4.
Finally, in Women’s Health Center of West County, Inc. v. Webster, 871 F.2d 1377 (8th Cir.1989), the Eighth Circuit, applying the rational basis test, upheld an abortion regulation which required emergency backup care against an equal protection challenge. See id. at 1381. The court noted that, although the regulation applied only to abortion providers, the state already required such backup care for all patients undergoing any outpatient surgery. See id. Thus, the regulation was a reasonable means of insuring the health of women seeking abortions and did not impose a special requirement upon abortion providers. See id.
It is unnecessary for me to decide whether the strict scrutiny test or the rational basis test should be applied in this case because Regulation 61-12 is constitutionally infirm under the more lenient rational basis test. Under the rational basis test, the court must determine the relation between the classification adopted and the objective to be attained. Romer, 517 U.S. at 632, 116 S.Ct. 1620. “The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority.” Id. “By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.” Id. at 633, 116 S.Ct. 1620. Furthermore, even if the disadvantaged group does not rise to the level of a suspect class entitled to the application of strict scrutiny, the court must closely scrutinize laws that disadvantage a politically unpopular group because such laws “raise[ ] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected.” Id. at 634, 116 S.Ct. 1620. “ ‘[I]f the constitutional conception of “equal protection of the laws” means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.’ ” Id. at 634-35, 116 S.Ct. 1620 (quoting Department of Agric. v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)).
*205 The defendants contend that Regulation 61-12 does not violate the Equal Protection Clause because its provisions are rationally related to the legitimate state interest of protecting the health and welfare of women seeking abortions in the state. I disagree.
Obviously, South Carolina has a legitimate interest in protecting the health and welfare of women seeking abortions in the state. South Carolina also has a legitimate interest in promulgating uniform, minimum standards for the performance of surgical procedures, including first trimester abortions. And South Carolina could constitutionally require that abortions only be lawfully performed by physicians licensed by the State Board of Medical Examiners to practice medicine pursuant to such uniform, minimum standards, thereby addressing any concern that unqualified, unlicenced physicians will come within its borders and establish unregulated abortion clinics performing unsafe abortion procedures.
However, as the district court noted,
[t]he regulation singles out physicians and clinics where abortions are performed regularly, as part of the normal course of business and in relatively large numbers, and imposes upon them requirements which are not imposed upon comparable procedures and not even upon all physicians who perform first trimester abortions. In addition, the regulation’s requirements reach far beyond those justified by actual differences in the procedure, or by the medical nature and risks of the procedure ....
Furthermore, defendants have offered no satisfactory explanation as to why the state standards applied to physicians’ offices and clinics performing comparable procedures would not suffice to regulate first trimester abortion providers or ensure the health, safety and welfare of patients seeking abortions — much less an acceptable basis for excluding physicians and facilities which perform first trimester abortions on a more infrequent basis....
Regulation 61-12 singles out all physicians and clinics who perform more than the occasional first trimester abortion and requires of them a license to operate their office or clinic. To obtain the license, the physicians and clinics must comply with comprehensive mandates governing the physical layout of the clinic or office, the medical equipment which must be purchased and maintained, the cleaning, maintenance, and operation of the clinic and the requisite equipment, the management and training of the staff, and the type of medical care and tests which must be administered and offered to the patients. The onerous, and largely unnecessary, requirements of this regulation are neither “narrow enough in scope [nor] grounded in a sufficient factual context for [the court] to ascertain that there existed some relation between the classification and the purpose it is now alleged to serve.”
Greenville Women’s Clinic, 66 F.Supp.2d at 742-43 (quoting Romer, 517 U.S. at 632-33, 116 S.Ct. 1620).
In summary, Regulation 61-12 singles out and places additional and onerous burdens upon abortion providers which are neither justified by actual differences nor rationally related to the state’s legitimate interest in protecting the health and safety of women seeking first trimester abortions. Rather, “its sheer breadth is so discontinuous with the reasons offered for it that [Regulation 61-12] seems inexplicable by anything but animus toward the class that it affects.” Romer, 517 U.S. at 632, 116 S.Ct. 1620. The fact that Regulation 61-12 was directed towards a politically unpopular group in the absence of any existing public health problem only bolsters this conclusion.[21] See id. at 632-34, 116 S.Ct. 1620.
*206 III
The only remaining issue in the ease is the question of severability. The defendants contend that the district court erred in refusing to sever the unconstitutional portions of Regulation 61-12 from the constitutional portions. This argument is without merit.
Whether Regulation 61-12 is subject to the doctrine of severability is a question of state, rather than federal, law. See Department of Treasury v. Fabe, 508 U.S. 491, 509-10, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Under South Carolina law,
[t]he test for severability is whether the constitutional portion of the statute remains complete in itself, wholly independent of that which is rejected, and is of such a character as it may fairly be presumed that the Legislature would have passed it independent of that which is in conflict with the Constitution.
Thayer v. South Carolina Tax Comm’n, 307 S.C. 6, 413 S.E.2d 810, 815 (1992) (citation and internal quotation marks omitted). Moreover, if the statutory or regulatory scheme does not contain a specific severability clause, the legislature or agency is presumed to have “intended the act to be effected as an entirety or not at all.” South Carolina Tax Comm’n v. United Oil Marketers, Inc., 306 S.C. 384, 412 S.E.2d 402, 405 (1991).
Applying this standard, I conclude that Regulation 61-12 is not a proper candidate for severance. Regulation 61-12 does not contain a severability provision, despite the fact that other DHEC regulations have included such provisions. See, e.g., S.C.Code Ann. Regs. 61-4, Part VI, § 601 (controlled substances regulation); S.C.Code Ann. Regs. 61-21, § T (sexually transmitted diseases). The absence of a severability clause is consistent with the scheme of the enabling legislation and the nature of the regulation. It is apparent that the South Carolina legislature intended for DHEC to create a comprehensive licensing scheme for abortion providers, as Regulation 61-12 sets forth areas to be addressed by the regulation as a whole, and the text of the regulation is comprehensive and interdependent, reflecting a similar intent that it stand or fall as a whole. In other words, because the South Carolina legislature directed DHEC to promulgate a comprehensive set of regulations governing virtually every aspect of the abortion procedure, it is evident that the South Carolina legislature intended for all of Regulation 61-12 to be enforced or none of it. Finally, I note that severance is simply not possible, as I am simply unable to “untangle the constitutional from the unconstitutional provisions.” Ragsdale, 841 F.2d at 1375.
IV
I have some final comments concerning Part IV of the majority opinion. The accusatory tone of this portion of the majority opinion, aimed at me and the district judge who decided the case below, can only *207 evince a majority which refuses to recognize that current Supreme Court precedent mandates that a woman still has the fundamental right to obtain an abortion. In its eagerness to uphold any impediment to a woman’s fundamental right to a previ-ability abortion, the majority, interjecting the emotional and psychological aspect of a woman’s decision, would desensitize the real and basic issue to be addressed when evaluating such regulations — that is, whether the regulations are medically necessary and, if so, whether the regulations impose an undue burden on a woman’s fundamental right to have an abortion at the previability stage of pregnancy. There is no doubt that the State of South Carolina can, within limits, treat abortions differently from other medical procedures. But to resolve the question of whether regulations governing abortions are medically necessary, some reference to comparable procedures is necessary, if not inevitable.
When considering the majority’s analysis based on its chosen and carefully selected facts, ignoring the findings of fact by the district court, it can only be concluded that the majority’s opinion is based on its view of the law as it would like to see it and, perhaps more significantly, on not what the current law would dictate, but only what the majority prophecies the law will be if and when this case reaches the Supreme Court. This is simply unacceptable; cases are to be decided on what the law is. It’s just that simple.
To sum up, Regulation 61-12 is violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and, under South Carolina law, Regulation 61-12 is not subject to the doctrine of severability. Accordingly, I would affirm the judgment of the district court.[22]

. An abortion clinic is defined as "[a]ny facility, other than a hospital ... in which any second trimester or five or more first trimester abortions per month are performed.” S.C.Code Ann. Regs. 61-12, § 101(B). Accordingly, the definition of abortion clinic includes any physician's office in which five or more first trimester abortions per month are performed.

. Although the Governor of South Carolina appeals only the district court’s order awarding costs and attorneys' fees, for ease of reference, I will refer to Bryant, the Governor of South Carolina, and the Attorney General of South Carolina as the defendants.

. Pregnancy is measured either from the date of a woman’s Imp or from conception, which is generally considered to occur two weeks after a woman’s Imp. Accordingly, eight weeks after the Imp is equivalent to six weeks from the date of conception. Under Regulation 61-12, the first trimester of pregnancy ends at fourteen weeks after the Imp. See S.C.Code Ann. Regs. 61-12, § 103(S).

.Because the plaintiffs in this case only provide abortions during the first trimester of pregnancy, the plaintiffs' challenge to Regulation 61-12 is limited to its application to providers of first trimester abortions in South Carolina. Accordingly, I express no opinion as to the constitutionality of Regulation 61-12 as applied to facilities that may seek to perform second trimester abortions in the future.

. By way of comparison, according to one of the plaintiffs' experts whose testimony was credited by the district court, having a first trimester suction curettage abortion is safer than having a shot of penicillin in a physician’s office.

. CLIA-88 has been amended, see 42 U.S.C.A. § 263a (West 1999). This amendment has no relevance to this case.

. Interestingly, DHEC's regulation governing ambulatory surgical centers contains a specific provision protecting the confidentiality of medical records. See S.C.Code Ann. Regs. 61-91, § 1001(E) (providing that records may only be removed from the premises by subpoena or court order).

. Section 309 mandates additional qualifications which the performing physician must possess, additional equipment which must be on hand, and additional medical tests which must be administered for second trimester abortions. See S.C.Code Ann. Regs. 61-12, §§ 309(A)-(D).

. In fact, Regulation 61-12 recognizes that the risks and potential complications of surgical procedures typically performed in ambulatory surgical centers are significantly higher than those associated with first trimester abortions. Under Regulation 61-12, licensed abortion clinics are restricted to performing abortions through eighteen weeks of pregnancy measured from the pregnant woman's Imp. See S.C.Code Ann. Regs. 61-12, § 302(A). Abortion clinics performing abortions beyond fourteen weeks of pregnancy measured from the pregnant woman's Imp must meet the additional patient requirements in Section 309 of Regulation 61-12, which requires additional physician qualifications, medical equipment, and mandatory laboratory tests. See id. § 302(B). Abortions beyond eighteen weeks of pregnancy measured from the pregnant woman's Imp must be performed in a hospital, although a licensed ambulatory surgical center that is also licensed as an abortion clinic may perform abortions on patients through twenty-six weeks of pregnancy measured from the pregnant woman's Imp. See id. § 302(A).

. Of note, the district court found that the defendants presented insufficient evidence to support a finding that sexually transmitted diseases are more prevalent in woman seeking abortions or that abortion clinics present a public health problem in this regard. See Greenville Women's Clinic, 66 F.Supp.2d at 733 n. 16.

. The lowest figure represents the defendants’ revision of the plaintiffs’ estimates of complying with Regulation 61-12. The highest figure represents the plaintiffs' estimate. The district court observed that neither figure, however, takes into account the standard 15% profit factor which the plaintiffs' accountant testified would be appropriate. See Greenville Women's Clinic, 66 F.Supp.2d at 717 n. 10.

. At trial, the parties entered into several notable stipulations concerning the cost of complying with certain specific provisions of Regulation 61-12:
(1) When directly billing physicians, laboratories in South Carolina generally charge between $20 and $40 per sample to perform a combined test for chlamydia and gonorrhea.
(2) When directly billing physicians, laboratories in South Carolina generally charge between $17 and $30 per sample to lest for the Du variant.
(3) When directly billing physicians, laboratories in South Carolina charge between $7 and $20 per sample to perform a test for syphilis and between $10 and $22 to perform a lest from a pap smear.

. At trial, the plaintiffs presented evidence that, to comply with Regulation 61-12, CWMC would require renovations costing approximately $27,235, that Dr. Lynn's Green-ville practice would require renovations costing approximately $2,700, that Dr. Lynn's Beaufort office would need renovations costing approximately $12,256, and that GWC would need renovations costing approximately $3,700.

.The district court's finding in this regard was premised on the testimony of the plaintiffs’ expert, Dr. Stanley Henshaw, who is currently deputy director of research at the Alan Guttmacher Institute in New York, where he conducts studies relating to family planning and abortion services. Dr. Hen-shaw testified that an increase in the price of abortion procedures prevents a number of women from obtaining abortions and causes other women to delay their abortions until further along into their pregnancies. Dr. Henshaw also testified that relatively small increases in the cost of an abortion will have this effect, and that an increase of just $25 can be expected to prevent one or two out of every 100 low-income women seeking an abortion from being able to obtain one. Dr. Henshaw also testified that a decrease in the number of abortion providers in South Carolina will result in a decrease in the number of women who are able to obtain an abortion in the state, and a corresponding increase in the number of women who must travel to obtain the procedure, e.g., from Beaufort to Savannah, Georgia and/or Charleston, South Carolina. Such a need to travel will, in turn, reduce the ability to obtain an abortion or result in a delay in obtaining the abortion. *193 And the need to travel carries its own costs, which will increase the overall cost of obtaining the abortion and compound the financial problem.

. In light of its ruling that Regulation 61-12 violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the district court declined to address the plaintiffs’ remaining claims that Regulation 61 — 12:(1) was unconstitutionally vague; (2) violated the abortion patients' confidentiality rights; and (3) violated the Establishment Clause of the First Amendment.

. Because Regulation 61-12 applies to first trimester abortion providers, the plaintiffs have standing to challenge the constitutionality of the regulation. See Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

. The Supreme Court in Casey overruled only those parts of Akron that were "inconsistent with Roe’s statement that the state has a legitimate interest in promoting the life or potential health of the unborn." Casey, 505 U.S. at 870, 112 S.Ct. 2791. Thus, the Akron decision continues to inform us as to the propriety of regulations purportedly enacted to further the state's interest in maternal health.

. In the district court, the defendants argued that selected diseases are more prevalent in women seeking abortions or that abortion clinics present a public health problem in this regard. However, the district court found insufficient credible evidence to support such a finding.

. The majority implies that Regulation 61-12 requires DHEC to treat all abortion patient records as confidential. See ante at 171-72. However, Regulation 61-12 imposes no such requirement on DHEC. Rather, under Regulation 61-12, only the abortion clinic must treat patient records as confidential. See S.C.Code Ann. Regs. 61-12, § 402. Succinctly put, Regulation 61-12 allows DHEC to enter an abortion clinic, inspect its records, and make photocopies of these records, see id. § 102(F), and Regulation 61-12 places no limitation on DHEC's use of the records once photocopies are made. Thus, Regulation 61-12 differs markedly from the provisions upheld by the Supreme Court in Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), two cases cited by the majority. See ante at 171-72. In each of these cases, the statute at issue required the state agency which had access to the patient records to treat the records as confidential and/or significantly limited the state agency's use of the patient records. See Whalen, 429 U.S. at 594, 97 S.Ct. 869 (New York statute had extensive measures to insure records remained confidential and provided that the public disclosure of the identity of patients was expressly prohibited); Danforth, 428 U.S. at 79-81, 96 S.Ct. 2831 (Missouri statute mandated that patient information required on patient forms was confidential and to be used only for statistical purposes). In my view, Regulation 61-12 is more akin to a provision of a Pennsylvania statute rejected by the Supreme Court in Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986); in that case, even though the Pennsylvania law under review stated that patient reports were not public records, Pennsylvania law permitted the reports, which contained both information about the women who obtained abortions and information about the doctors who performed them, to be made public and also did not limit the Commonwealth's use of patient information. See id. at 764-68, 106 S.Ct. 2169. One other point on the issue of confidentiality is worth noting. Both the guidelines of the NAF and ACOG prohibit the release of any medical record without the patient's consent.

. The majority seems to intimate that an increase in the cost of obtaining an abortion effectuated by the promulgation of a health regulation is irrelevant to the undue burden calculus. See ante at 170-71. According to the majority, to hold otherwise "would necessitate the formulation of an arbitrary cost threshold beyond which a price increase may not pass." Id. at 171. This, in turn, "would irrationally hamstring the State’s effort to raise the standard of care in certain abortion clinics ... simply because the clinics’ perfor-manee falls so far below appropriate norms that the expense of upgrading their practices and equipment exceeds the arbitrarily defined amount.” Id. at 171. Unlike the majority, I believe that an increase in the cost of having an abortion effectuated by the promulgation of a health regulation is highly relevant to the undue burden inquiry. First, in Casey, the Supreme Court noted that a significant increase in the cost of obtaining an abortion alone can constitute an undue burden on the right to have an abortion. See Casey, 505 U.S. at 901, 112 S.Ct. 2791 ("While at some *203 poinl increased cost could become a substantial obstacle, there is no such showing on the record before us.”). Second, the Supreme Court stated in Casey that a statute which, while furthering a state interest, has the effect of placing a substantial obstacle in the path of a woman’s choice cannot be considered a permissible means of serving its legitimate ends. See id. at 877, 112 S.Ct 2791.

. Although the South Carolina legislature direeled DHEC to regulate abortion facilities *206 which performed five or more first trimester abortions per month, while leaving other licensed physicians under the exclusive supervision of the Board of Medical Examiners, it is undisputed that DHEC retained the discretion to refrain from treating abortion clinics and abortions differently than comparable facilities and procedures. For example, DHEC could have treated abortion clinics like other physicians' offices and clinics by promulgating regulations consistent with what is already required in physicians' offices by other laws and accepted standards. As to the physical plant requirements of Regulation 61-12, DHEC could have adopted regulations requiring the abortion clinic to meet all applicable building codes. As to staff qualifications and medical records, DHEC could have required the supervising physician to hire staff and maintain medical records that, in his or her professional discretion, would appropriately provide for the needs and rights of the patients. On the other hand, with regard to needs unique to the abortion procedure, DHEC could have treated abortion providers differently from other physicians' offices and clinics, but only based on actual differences between those facilities. Instead, DHEC placed onerous burdens upon abortion providers which are neither justified by actual differences nor rationally related to the state’s legitimate interest in protecting the health and safety of women seeking first trimester abortions.

. With regard to the argument of the defendants attacking the district court’s award of attorneys' fees, the argument is without merit.